1

2

3

4                         UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    NORBERTO SERNA,                         Case No.  21-cv-02654-WHO

8                  Plaintiff,

9           v.                               **ORDER DENYING WRIT OF HABEAS
                                             AND REQUEST FOR EVIDENTIARY
10   DAVID HOLBROOK, et al.,                 HEARING**

                 Defendants.                 Re: Dkt. Nos. 1, 24
11

12

13                              **INTRODUCTION**

14         Petitioner Norberto Serna seeks federal habeas relief from his state convictions on several

15   grounds, including that there was insufficient evidence to support his convictions, he was

16   insufficiently advised of his *Miranda* rights, and his trial counsel rendered ineffective assistance.

17   None of his claims has merit.  The petition is **DENIED.**

18                              **BACKGROUND**

19         On February 6, 2011, Serna and two other men broke into Gary Wise's house, beat him,

20   and robbed him of valuables stored in two safes.  Serna was subsequently arrested and charged

21   with 10 counts, including kidnapping to commit extortion, kidnapping to commit robbery, and

22   torture.  Serna, who was tried separately from his codefendants, was convicted by a Santa Clara

23   Superior Court jury of all 10 counts.[1]  Serna was sentenced to life without the possibility of parole.

24   He appealed, lost, sought a state writ of habeas corpus, and lost again.  This federal habeas petition

25   followed.

26

27   _____

28   [1] The ten charges consist of: (1) kidnapping for extortion; (2) kidnapping to commit robbery; (3) torture;
     (4) assault with a deadly weapon; (5) criminal threats; (6) first degree robbery; (7) first degree burglary; (8)
     grand theft of firearms; (9) theft of an automobile; and (10) arson of another person's property.

United States District Court
Northern District of California

The California Court of Appeal summarized the facts of the crimes as follows:

On February 6, 2011, [Gary] Wise lived on Rucker Avenue in a house in an unincorporated area in Gilroy, California. The driveway between Wise's house and Rucker Avenue was approximately a quarter mile long. [Juvenal Angel] Reyes lived across the street from Wise.

Serna knew Reyes. He and his son, Isaias Serna, sometimes worked for Reyes. Reyes told Serna that Wise was wealthy and they should rob him. Reyes introduced Serna to [Ernesto] Gonzales and [Juan Carlos] Fonseca and told the men that Wise had two safes inside his house. Serna, Isaias, Gonzales, and Fonseca met with Reyes to plan the burglary. The men devised a plan to watch Wise, wait for him to leave his house, and break into the house under the cover of darkness. Gonzales asked Isaias to watch Wise during the burglary.

The day of the crime, Gonzales followed Wise to Wise's ex-wife's house. After Wise reached his destination, Gonzales drove back, picked up Serna and Fonseca, and dropped them off at Wise's house. Serna and Fonseca broke into the house while Wise was away. Meanwhile, Gonzales drove back to Wise's ex-wife's house to continue his surveillance.

The objective of the crime was to steal the two safes inside Wise's home. Serna and Fonseca attempted to move the safes, but they were too heavy to be moved. Fonseca called Gonzales and told him they were unable to take the safes. Gonzales called Isaias and asked him to take over surveilling Wise at his ex-wife's house. Shortly thereafter, Gonzales joined Fonseca and Serna at Wise's house. Gonzales wore gloves and a mask, and was in possession of a semiautomatic handgun. Together, the three men again attempted to move the safes but were still unable to do so. In the meantime, they took several television sets. Sometime later, Isaias called Gonzales and told him that Wise was on his way back home.

Serna and Fonseca told Gonzales they should leave, but he refused. Gonzales told Serna to position himself at the door. Fonseca stood in the hallway and Gonzales stood on the other side. Serna armed himself with what he called a "children's bat," an item that was described during the trial as a tire thumper. Gonzales and Fonseca picked up pool cues. Gonzales told Fonseca and Serna the plan was to hit Wise and tie him up.

When Wise returned home, he opened the front door to his house. Immediately, Serna, Gonzales, and Fonseca beat Wise. A pool cue used during the beating splintered in half during the assault. The tire thumper Serna used broke into several pieces when he hit Wise. At trial, Wise testified he was beaten inside the house. However, during Serna's interview with officers following his arrest, Serna said that when Wise fell from the front steps of his door outside . . . the men started beating him. While Wise lay on the ground, the men zip-tied his feet together, carried him inside the house into the kitchen past the room where Wise kept his two safes, and tied him to a kitchen chair. The kitchen was approximately 25 or 30 feet from the

front door.  The men spoke to each other in Spanish, which Wise could not understand.

Afterwards, the three men picked the chair up with Wise in it and sat him in front of one of his two safes, which was approximately 20 feet away.  One of the men placed a towel over Wise's head, obscuring his view.  Wise already had trouble seeing out of one of his eyes due to the injuries he had sustained during the beating.  Wise recalled that one of the men asked him for the combination to his black-colored safe and threatened his son if he refused.  That man then put a gun inside Wise's mouth. Wise initially told the men he did not have the combination to the safe, because he did not want them to steal the items, which included guns, that were inside.  Wise acceded to the men's demands after they threatened his son.

The men attempted to open the safe with the combination, but were unable to do so. Wise asked the men to untie him so he could open the safe for them.  They told him no.  Wise then offered to open the safe if the men stood him up.  The men agreed, and Wise opened the safe, which contained approximately 25 to 30 guns.  The men emptied the safe and placed the guns on a blanket.

The men then turned their attention to Wise's second safe.  The men asked Wise for the second safe's combination.  Wise told them he did not know the combination, because the safe belonged to his wife.  The safe contained several keepsakes Wise intended on giving to his son, casino chips Wise had been collecting, antique jewelry, and approximately $20,000.  One of the men beat Wise several times with the pool cue to get him to divulge the combination.  Another one of the men took a pair of pliers and squeezed the inside of Wise's nostrils.  Afterwards, Wise told them the combination to the second safe was the same as the combination for the first safe. The men were able to open the safe by themselves.  They emptied the contents of the safe into plastic storage bins and loaded the items onto Wise's truck.

After the men gathered the items in the safe, the house became quiet.  Wise did not hear anything for the next 15 or 20 minutes.  He continued to sit in the chair for approximately 30 minutes.  Eventually, he was able to get inside his kitchen and free himself with a knife.  The entire process took approximately three hours.

Wise opened the front door and saw his truck was gone.  He was unable to find his cell phone or his wallet.  He went back to his bedroom and sat on his bed for half an hour.  He then made his way to a neighbor's house.  It took him approximately an hour to an hour and a half to walk over, because he was in pain and kept falling down. His neighbor answered the door and called the police.

Sometime after committing the crime, Gonzales and Fonseca took the stolen property and stored it in an apartment Gonzales shared with his wife, Araceli.  Gonzales drove Wise's truck, with Fonseca and Serna following.  They reached a mountainous area and doused the truck with gasoline.  Gonzales lit the truck on fire.

Afterwards, Serna called Gonzales and asked for a share of the stolen property. Gonzales told Serna he would have to wait.  At some point, Gonzales disconnected his phone.  Serna never received payment from Gonzales.

On February 7, 2011, Santa Clara County Sheriff's Office Deputy John Gonzalez responded to a report of a vehicle fire on Highway 9. When he arrived, the truck was still burning. The fire department was working to extinguish the flames. Deputy Gonzalez was unable to read the full license plate, but he noticed it was a personalized license plate. California Highway Patrol Officer Tyler Pudg obtained the charred license plate. Officer Pudg was able to make out a portion of the license plate. He went through several combinations of what the license plate could be, and was eventually able to match the license plate to Wise's truck.

On March 23, 2011, Santa Clara County Sheriff's Office Detective Sergeant Julian Quinonez received a tip from a citizen's informant about Wise's robbery. The informant provided Quinonez with information that had not been released to the media, including several names and a telephone number. Based on the information given by the informant, Quinonez focused his investigation on Serna, Gonzales, Reyes, and Isaias.

On May 3, 2011, officers arrested Serna, Gonzales, Fonseca, Isaias, and Araceli. Officers searched Gonzales's apartment but did not recover any stolen property. Isaias and Serna admitted they participated in the crime.

A few weeks later, Araceli called Sergeant Quinonez. Araceli told Quinonez that she had been cleaning her apartment, which she shared with Gonzales, when she noticed her carpet looked different. She consented to another search of the house. After removing the carpet and some of the floorboards, officers discovered the stolen property.

*See People v. Serna*, Appeal Case No. H041769 (Jan. 29, 2018) ("App. Opn").

As grounds for federal habeas relief, Serna raises fourteen claims based on the following arguments: (1) there was insufficient evidence supporting his convictions for kidnapping to commit robbery and kidnapping to commit extortion; (2) he was insufficiently advised of his *Miranda* rights and his waiver of rights was not voluntarily made; (3) his statements to the police were made involuntarily as a result of police coercion and because he was not informed of his right to consular notification in violation of the Vienna Convention; (4) his son's testimony at trial was improperly impeached with prior inconsistent statements; (5) the trial court erred when it instructed the jury on kidnapping to commit extortion; (6) his sentence of life in prison without the possibility of parole is disproportionate under the federal and state Constitutions; (7) his sentence violates equal protection principles; (8) his trial counsel rendered ineffective assistance of counsel by failing to challenge the search warrant for Serna's historical cell site location information and by failing to argue that the Vienna Convention violation resulted in an involuntary statement; and

1  (9) cumulative errors require reversal of the convictions and sentence.  Petition ("Pet.") [Dkt. 1] at

2  4–5.

3  ## LEGAL STANDARD

4      Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), I may

5  entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the

6  judgment of a State court only on the ground that he is in custody in violation of the Constitution

7  or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted

8  with respect to any claim that was adjudicated on the merits in state court unless the state court's

9  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

10  unreasonable application of, clearly established Federal law, as determined by the Supreme Court

11  of the United States; or (2) resulted in a decision that was based on an unreasonable determination

12  of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

13      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

14  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

15  the state court decides a case differently than [the] Court has on a set of materially

16  indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

17      "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

18  the state court identifies the correct governing legal principle from [the] Court's decisions but

19  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413. "[A] federal

20  habeas court may not issue the writ simply because that court concludes in its independent

21  judgment that the relevant state-court decision applied clearly established federal law erroneously

22  or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas

23  court making the "unreasonable application" inquiry should ask whether the state court's

24  application of clearly established federal law was "objectively unreasonable."  *Id.* at 409.

25  ## DISCUSSION

26      Serna raises fourteen claims in his habeas petition, of which twelve remain.[2]  He also

27  _____

28  [2] In the traverse, Serna acknowledged that Claim 3 is procedurally defaulted and Claim 4 is not cognizable

United States District Court
Northern District of California

argues that he is entitled to an evidentiary hearing for two of his claims.  To decide whether to grant an evidentiary hearing, I must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.*  Accordingly, I first consider whether Serna could be entitled to habeas relief based on the claims asserted in the petition, and then I take up his request for an evidentiary hearing.

I address each claim in turn below.

# I.   SUFFICIENCY OF THE EVIDENCE (CLAIM 1 AND CLAIM 2)

Serna first argues that two of his convictions—for kidnapping to commit robbery and kidnapping to commit extortion—are not supported by sufficient evidence.  I disagree.

### A.   The Court of Appeals Reasonably Held that There Was Sufficient Evidence of Asportation to Support Serna's Conviction for Kidnapping to Commit Robbery

Serna argues that there is insufficient evidence supporting his conviction for kidnapping to commit robbery based on the asportation element of the offense.  Serna claims that Wise, the victim, "was not moved a substantial distance" and "[t]he movement was merely incidental to the commission of the robbery."  Pet. at 8.

The asportation element of the kidnapping to commit robbery offense requires that "the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."  Cal. Pen. Code § 209(b)(2).  Serna concedes that the evidence at trial demonstrated that he and his accomplices carried Wise into his house, moved Wise 25 to 35 feet into the kitchen; tied him up; and then moved him another 20 feet into the living room.  Pet. at 8.  According to

under *Stone v. Powell*, 428 U.S. 465 (1976).  *See* Traverse [Dkt. 22] at 11.  To overcome a procedural bar, Serna must demonstrate cause and prejudice or a fundamental miscarriage of justice.  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wells v. Maas*, 28 F.3d 1005, 1008 (9th Cir. 1994).  Serna does not attempt to do so.  *See* Traverse at 11.  Habeas relief for Claims 3 and 4 is **DENIED.**

6

United States District Court
Northern District of California

1    Serna, though, these movements were "incidental to the robbery" and "did not put [Wise] in any

2    additional danger." *Id.* at 9. As a result, Serna contends that these movements cannot satisfy the

3    asportation requirement of the offense. *Id*. at 10.

4         When reviewing a state court's conviction for sufficiency of the evidence, a federal court

5    must determine whether, "after viewing the evidence in the light most favorable to the

6    prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

7    a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Only

8    if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ

9    be granted. *Id.* at 324. "[T]he only question under *Jackson* is whether [the jury's] finding was so

10   insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S.

11   650, 656 (2012). In addition to this highly deferential standard, a federal court must afford

12   "considerable deference" to a state court's determination that there was sufficient evidence. *Id.*

13        The Court of Appeals reasonably held that there was sufficient evidence that the

14   movements of Wise went beyond that necessary to commit the crime. The Court of Appeals

15   observed that the critical question is not whether the "relatively minimal movement" was, "by

16   measurement," sufficient to satisfy the asportation element. App. Opn. at 9. "Rather, the

17   dispositive issue is whether the movement was not merely incidental to the underlying crime of

18   robbery and increased the victim's risk of harm." *Id.* The Court of Appeals noted that the jury

19   could have concluded that "moving Wise inside the house *at all* was unnecessary [because] [t]he

20   men could have asked Wise for the combination when they assaulted him at his front door." *Id.* at

21   12 (emphasis in original). The Court of Appeals also found the jury could reasonably infer that

22   moving Wise into his house allowed the men to "gain even greater control over him" and

23   "substantially decreased Wise's possibility of detection, escape, or rescue." *Id.* at 12–13. After

24   finding that the movement increased Wise's risk of harm and was unnecessary, the Court of

25   Appeals concluded that the asportation element of the crime had been satisfied. *Id.* at 14.

26        I conclude that habeas relief is not warranted for this claim. The Court of Appeals'

27   decision was reasonable and is entitled to AEDPA deference. This claim is **DENIED.**

28

**B.      The Court of Appeals Reasonably Held that Sufficient Evidence Supported Serna's Conviction for Kidnapping to Commit Extortion.**

Serna argues that his conviction for kidnapping to commit extortion is not supported by sufficient evidence because Serna "did not seek Wise's consent to take his property" and because a "combination to a safe is not personal property." Pet. at 11–12.  According to Serna, he did not have the specific intent to induce Wise's consent because he was "after the property in the safes, not Wise's consent." *Id.* at 11.  Serna also argues that the crime of kidnapping to commit extortion is exclusively intended to apply to situations involving multiple victims, and here, Wise was the only victim. *Id.* at 12.

Under California law, the elements of kidnapping to commit extortion are: (1) the defendant kidnapped, seized, or confined another person; (2) the defendant held or detained that person; (3) the defendant did so to commit extortion; and (4) the other person did not consent to being kidnapped, seized, or confined.  *See* Judicial Council Of California Criminal Jury Instruction 1202 ("CALCRIM 1202").  As set forth below, the Court of Appeals reasonably held that Wise gave forced consent, that he turned over money or something of value when he provided the safe combinations, and that extortion does not require a secondary victim.

**1.      Consent**

The Court of Appeals reasonably found that Serna had the specific intent to induce Wise into parting with his property.  App. Opn. at 15.  The Court of Appeals determined that Serna intended to obtain Wise's consent through force and fear, and that by giving the safe combinations to the men, Wise unwillingly consented. *Id.* at 16.

The jury heard evidence that Serna, Fonseca, and Gonzales remained in Wise's house after learning that he was returning home because the men were unable to remove the safes without his help. *Id.* at 3–4.  Because "the combinations to the two safes were intangible items," "Serna and the other men could not physically take the combinations to the safes from Wise against his will." *Id.* at 15.  "Thus, the jury could reasonably infer from the evidence presented that Serna acted with the intent to force Wise to consent—unwillingly, through the use of fear—and divulge the combinations to the safes." *Id.*  The Court of Appeals reasonably concluded that even though "Wise may have unwillingly parted with the combinations to his safes," "his unwillingness does

8

1    not as a matter of law negate his consent." *Id.* at 16.

2                    **2.      Property**

3           Serna next argues that there is insufficient evidence to support a conviction for kidnapping

4    by extortion because the safe combinations are intellectual constructs, not property.  Pet. at 11–12.

5    There are several problems with this theory.

6           First, "property" is not an element of extortion.  Under California law, extortion is "the

7    obtaining of property *or other consideration* from another, with his or her consent . . ."  Cal. Penal

8    Code § 518(a) (emphasis added).  "Consideration" is defined to mean "anything of value."  Cal.

9    Penal Code § 518(b).  Serna cites Penal Code section 211 to support his theory that extortion

10   requires receipt of "money or property," *see* Pet. at 11, but section 211 defines robbery, not

11   extortion.  Cal. Penal Code § 211 ("Robbery is the felonious taking of personal property in the

12   possession of another, from his person or immediate presence, and against his will, accomplished

13   by means of force or fear.")  The basis for Serna's argument is thus fundamentally flawed: under

14   California law, the safe combination does not need to be "property" to meet the elements of

15   extortion.

16          Second, even if extortion was limited to money or property rather than "anything of

17   value," the Court of Appeals reasonably held that the combinations to the safes fit within that

18   definition based on other decisions by the Court of Appeals.  App. Opn. at 16.  *People v.*

19   *Kozlowski*, for instance, had rejected a similar argument that personal identification numbers (PIN

20   codes) were not property that could be extorted under California law.  *People v. Kozlowski*, 96

21   Cal. App. 4th 853, 866–68 (2002).  *Kozlowski* explained that "the fact that a PIN code is intangible

22   property does not preclude a finding that it constitutes property within the meaning of our

23   extortion statute."  *Id.* at 868–69.  The Court of Appeals found that *Kozlowski* was "applicable" to

24   the present case because "[c]ombinations to safes are analogous to PIN codes associated with bank

25   accounts."  App. Opn. at 17–18.  It reasonably analogized to *Kozlowski* and concluded that there

26   was sufficient evidence from which the jury could infer that Serna extorted property from Wise.

27          Finally, to the extent that Serna takes issue with the Court of Appeals' interpretation of

28   *Kozlowski* and Penal Code sections 518(a) and 211, such challenges exceed my scope of review.

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1   Serna is wrong on the merits because he conflates the statute governing extortion (Cal. Penal Code

2   section 518(a)) with the robbery statute (Cal. Penal Code section 211).  But putting that aside, "it

3   is not the province of a federal habeas court to reexamine state-court determinations on state-law

4   questions.  In conducting habeas review, a federal court is limited to deciding whether a

5   conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*,

6   502 U.S. 62, 67–68 (1991).  In other words, "a state court's interpretation of state law . . . binds a

7   federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  Serna's

8   contention that the California courts erred in their interpretation of "property" under California

9   law is not remediable on federal habeas review.

### 3.        Secondary Victim

11          Serna argues that his conviction must be reversed because section 209(a) is only intended

12  to apply in those situations involving multiple victims and here there is no evidence of a secondary

13  victim.  Pet. at 12.  According to Serna, the kidnapping to commit extortion statute requires a

14  primary and secondary victim, where one of the victims is taken and the other victim is subjected

15  to a random or extortion demand.  *Id.*  In support of his argument, Serna points me to *People v.

16  Martinez*, 150 Cal. App. 3d 579, 591 (1984) and *People v. Chacon*, 37 Cal. App. 4th 52, 63

17  (1995).  *Id.*

18          When considering this argument, the Court of Appeals began by noting that "[m]ultiple

19  courts have concluded that kidnapping for extortion does not require a secondary victim."  App.

20  Opn. at 18.  The Court of Appeals next found Serna's reliance on *Martinez* and *Chacon* to be

21  "misplaced" because "the language in *Chacon* and *Martinez* suggesting kidnapping for extortion

22  requires a secondary victim is dicta."  *Id.* at 19.  Because section 209(a) was not ambiguous, the

23  Court of Appeals rejected Serna's argument that the statute was unconstitutionally vague in

24  violation of his due process rights.  *Id.*

25          Serna has not shown that the Court of Appeals' decision on this point was unreasonable.

26  And to the extent that Serna takes issue with the Court of Appeals' interpretation of the

27  kidnapping to commit extortion statute, that argument is not cognizable on federal habeas review.

28  *Estelle*, 502 U.S. at 67–68.

1    I conclude that habeas relief is not warranted for this claim.  The Court of Appeals'

2    decision was reasonable and is entitled to AEDPA deference.  This claim is **DENIED**.

3    **II.     MIRANDA VIOLATION (CLAIM 5)**

4    Serna argues that he did not understand his *Miranda* rights from the outset of the

5    interrogation and thus did not knowingly and intelligently waive them.  Serna also argues that his

6    waiver was involuntary due to "intimidating and coercive conduct by the police."  Pet. at 24.  The

7    Court of Appeals recounted the relevant facts regarding Serna's interrogation as follows:

8

9        On August 11, 2014, Serna filed a motion in limine seeking to exclude the statements
         he made to Sergeant Quinonez after his arrest.  Serna argued he was not properly
10       advised of his rights under *Miranda*, *supra*, 384 U.S. 436, and his waiver was not
         knowing or voluntary. The trial court held a hearing on the matter the same day.
11

12       According to testimony presented at the hearing, Serna was arrested after an officer
         used a canine to locate him in a field.  He was thereafter taken to the cafeteria at the
13       second floor of the sheriff's office in San Jose at approximately 9:30 a.m.  At
         approximately 4:30 p.m., Serna was taken to an interrogation room.  Sergeant
14       Quinonez began Serna's interrogation at approximately 6:00 p.m.  A video and a
         transcript of the interview were submitted to the court.
15

16       Prior to the start of the interview, Sergeant Quinonez advised Serna in Spanish of his
         *Miranda* rights.  Spanish was Quinonez's first language, and he regularly spoke
17       Spanish to his family.  With some alterations, Quinonez read Serna *Miranda*
         advisements from a department-issued *Miranda* card.
18

19       When Sergeant Quinonez advised Serna he had the right to remain silent, he used the
         words "no decir nada," which the defense's expert, Romero Rivas, translated as
20       "[y]ou have the right to say nothing." Quinonez asked Serna if he understood, and
         Serna answered in Spanish, "Well, um, I don't know.  I can answer whatever you tell
21       me, whatever."   Quinonez found Serna's statement to be ambiguous.   Thus,
         Quinonez repeated the same admonition (that he had the right to "say nothing") to
22       Serna.  After repeating the admonition, Serna responded that he understood.  The
         prosecution's interpreter translated the phrases as "you have the right not say
23       anything" and "you have the right to not say anything."

24       Next, when Sergeant Quinonez advised Serna of his right to have an attorney, he did
         not use the verb "to pay" as printed on the department's *Miranda* card ("pagarle").
25       Instead, Quinonez used the verb "a pagar."  Quinonez testified he used "a pagar" in
         the form of two words, which meant to pay.  If he had used the word "apagar" (one
26       word), he would have been telling Serna he could "turn off" the attorney.

27

28       Serna's expert testified that after listening to the interrogation tape it was unclear
         whether Sergeant Quinonez used the words "a pagar" or "apagar."  If Quinonez used

the word "apagar," his statement would have been: "Okay. And if you cannot turn off for an attorney, one be named for free, um, before and during any integration." If Quinonez used the word "a pagar," his statement would be translated as: "Okay. And if you cannot pay for an attorney, one be named for free, um, before and during any integration." Additionally, instead of using the word "interrogation," Serna's expert believed Quinonez used the word "integration" when advising Serna of his rights. The prosecution's interpreter heard Quinonez use the word "interrogation," which was reflected in the prosecution's prepared transcript.

After completing his interrogation, Quinonez asked Serna if he wanted an attorney. Serna responded he did not have the money to pay for one.

Following the hearing, the trial court determined the admonitions given by Sergeant Quinonez were sufficient. The trial court acknowledged there were issues with the *Miranda* warning, as the defense expert heard the word "integration," not "interrogation," and there was a dispute over whether Quinonez used the words "a pagar" or "apagar." Nonetheless, the trial court determined Serna understood the required admonitions under the totality of the circumstances. The court also concluded that in context, Serna's statement about not being able to afford an attorney had "nothing to do with the current right to a lawyer in the interview, but had to do more with whether a lawyer in the future would cost him."

App. Opn. at 28–30.

Before proceeding with a custodial interrogation, a suspect must be advised of his *Miranda* rights: that he "'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). The Supreme Court has explained that *Miranda* warnings do not require a "precise formulation" or "talismanic incantation." *California v. Prysock*, 453 U.S. 355, 359 (1981). To determine whether an advisement is adequate, a reviewing court "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). Instead, the question is "simply whether the warnings reasonably 'convey to a suspect his rights as required by *Miranda*.'" *Id.* (quoting *Prysock*, 453 U.S. at 361) (cleaned up).

**A. Sufficiency of Sergeant Quinonez's Spanish *Miranda* Warnings**

Serna argues that he was not sufficiently advised of his *Miranda* rights. Pet. at 23–26. The Court of Appeals, however, reviewed each of the warnings provided by Sergeant Quinonez

and reasonably determined that they adequately apprised Serna of his rights.  App. Opn. at 32–35.

### 1.    Right to Have Attorney Present During Questioning

Serna argues that Quinonez's statements did not accurately convey that he had the right to an attorney during questioning because—according to Serna's expert—Quinonez told him that he had the right to an attorney during any "integration," not any "interrogation."  Pet. at 21.  Serna theorizes that a layperson may assume that an "integration" refers to a future legal proceeding, and that, as a result, the statement did not sufficiently convey to him that he had the right to an attorney during his interview with the police.  *Id.* at 23.  According to the People's translator, though, Quinonez advised Serna that he had the right to an attorney "before and during any questioning," not before an "integration."  App. Opn. at 32.

The Court of Appeals concluded that there was substantial evidence to support the trial court's determination that Quinonez adequately conveyed the right to have an attorney present during questioning based on the People's translation.  To the extent that Serna is asking me to find that the Court of Appeals made an "unreasonable determination of the facts" by relying on the prosecution's translation of the *Miranda* warning, Serna has not provided any authority to support such a theory.  And in any event, there was ample evidence to support the prosecution's translation that Quinonez used the term "interrogation," not "integration."  Quinonez was a native Spanish speaker who regularly spoke Spanish to his family and was certified by the county as a qualified Spanish speaker; he presumably had given *Miranda* warnings repeatedly over his nearly 20-year career with the Santa Clara County Sheriff's Department.  *See* App. Opn. at 29; *see also* Aug. 12, 2014 Tr. [Dkt. 15-10] at 237:7-9, 292:15-17.  Additionally, Serna indicated that he understood the advisement.  *Id.* at 276:8-22.  Had Serna heard Quinonez advise him that he had the right to an attorney during any "integration," it is reasonable to think that Serna would have asked for clarification.

I conclude that the Court of Appeals' decision was reasonable and is entitled to AEDPA deference.  The right to have an attorney present at questioning was adequately conveyed to Serna.

### 2.    Right to Have an Attorney Appointed at No Cost

Serna next argues that Sergeant Quinonez did not adequately convey the right to have an

appointed attorney at no cost based on Serna's contention that Quinonez used the term "apagar" (which means to turn off) rather than "a pagar" (which means to pay). Pet. at 23. Importantly, these terms are "phonetically the same. The only difference is whether there was a pause between the two words." App. Opn. at 33. The Court of Appeals found that there was "substantial evidence" that supported "the trial court's inference that Quinonez used the phrase 'a pagar' and sufficiently conveyed to Serna his *Miranda* rights." *Id.*

The Court of Appeals cited several pieces of evidence to support its conclusion that the *Miranda* warning was sufficiently conveyed. First, the trial court listened to a clip of the interrogation so that it could consider the disputed terms within the context of the interrogation. App. Opn. at 33. Second, Serna's own expert conceded that the statement could be interpreted as either "a pagar" or "apagar." *Id.* Third, the prosecution's translator interpreted the term as "a pagar." *Id.* Finally, the term "apagar" would have resulted in "a nonsense phrase—that Serna could turn off an attorney if he so chose." *Id.* The Court of Appeals reasoned that if Serna "had interpreted Quinonez's advisement to mean he could 'turn off' an attorney if he so desired, it seems likely he would have asked for further clarification or indicated that he did not understand the nonsensical phrase." *Id.*

Serna argues that Quinonez's advisement must have been ambiguous because, towards the end of the interrogation, Serna told Quinonez that he could not afford an attorney when asked if he wanted one. Pet. at 26. But the Court of Appeals found that substantial evidence supported the trial court's contrary interpretation of this interaction. App. Opn. at 33–34. After "considering the context of the conversation," the trial court concluded that "Serna's statement had to do with his understanding of whether an attorney would be provided to him to mount his defense, *not* whether he had the right to an attorney present during the interrogation." *Id.* (emphasis in original). As the evidence described above shows, substantial evidence supports the Court of Appeals' finding that Serna was properly advised of his right to have an attorney appointed for free.

I conclude that the Court of Appeals' decision was reasonable and is entitled to AEDPA deference. The right to have an attorney appointed at no cost was adequately conveyed to Serna.

### 3.      Right to Remain Silent

Finally, Serna contends that Quinonez did not adequately inform him of his right to remain silent because Quinonez used the phrase "no decir nada" when reciting his *Miranda* rights, which Serna translates as "your right not say nothing." Pet. at 23. When Serna responded with: "Um, well, uh, uh, I don't know. I can answer what you tell me, whatever," *id.*, Quinonez reiterated that "I am going to explain to you, you have your right to say nothing. Do you understand that?"[3] *Id.* Serna argues that the double negative contained in the first warning essentially conveyed to Serna that he had the right *to speak to an officer*, not a right *not to speak to an officer*. Pet. at 23–24.

The Court of Appeals rejected this theory because substantial evidence showed that the Spanish phrase spoken by Quinonez advised Serna he had the right to not say anything to the police, not the converse. During the suppression hearing, Quinonez testified that his statement translated to "the right not to say anything" or "the right to say nothing." App. Opn. at 34. The prosecution's translator translated the phrase as "you have the right not say anything" and "you have the right to not say anything." *Id.* Additionally, after Sergeant Quinonez repeated and clarified the warning, Serna said that he understood. *Id.* at 35. I agree with the Court of Appeals that substantial evidence supports the finding that Quinonez's advisements reasonably conveyed to Serna that he had the right not to speak with the police.

I conclude that the Court of Appeals' decision was reasonable and is entitled to AEDPA deference. The right to remain silent was adequately conveyed to Serna.

### B.      Serna's Waiver Was Voluntary and Knowing

Because I have concluded that Serna was properly advised of his rights under *Miranda*, I turn to his second argument that his waiver was neither voluntary nor knowing because it was "obtained as a result of intimidating and coercive conduct by the police." Pet. at 24.

A suspect's waiver of *Miranda* rights is valid only if it is voluntary, knowing, and intelligent. *United States v. Ford*, 563 F.2d 1366, 1367 (9th Cir. 1977). The waiver inquiry "has two distinct dimensions"—first, it must be "voluntary in the sense that it was the product of a free

---

[3] According to the transcript, Quinonez first advised Serna as follows: " . . . usted tiene su derecho a no decir nada, entiendes ese derecho?" The second time, Quinonez advised Serna as follows: " . . . . usted tienes su derecho de no decir nada? Entiendes o no?" App. Opn. at 35 n.8.

1    and deliberate choice rather than intimidation, coercion, or deception," and second, it must be

2    "made with a full awareness of both the nature of the right being abandoned and the consequences

3    of the decision to abandon it."  *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (quoting

4    *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  A waiver satisfies this two-part standard only "if

5    the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice

6    and the requisite level of comprehension."  *Burbine*, 475 U.S. at 421 (quoting *Fare v. Michael C.*,

7    442 U.S. 707, 725 (1979)).

8         Serna argues that police coercion rendered his waiver involuntary because he feared attack

9    by a canine when he was taken into custody, he was detained for nine hours before he was

10   interrogated, he did not know why he was being detained, and he was handcuffed during his

11   detention; his handcuffs were removed only after *Miranda* warnings were given.  Pet. at 24.

12   Finally, he was not advised of his right to consular notification under the Geneva Convention.[4]  *Id.*

13   According to Serna, these "coercive factors" rendered his waiver and subsequent confession

14   involuntary.  *Id.*

15        The Court of Appeals found that Serna's waiver of rights was voluntary and knowing

16   because Serna did not point to any evidence suggesting that the circumstances of his interrogation

17   were employed by the police to pressure him into waiving his rights.  There was nothing to

18   indicate that the presence of the police dog during Serna's arrest, which occurred hours *before* his

19   interrogation, led to a coercive environment *during* the interrogation.  The dog was not used

20   during the interrogation to apply psychological or physical pressure on Serna, for instance, nor

21   was he advised of his *Miranda* rights in the dog's presence.  App. Opn. at 36.  As for Serna's

22   claim that the length of time between his arrest and initial interrogation was coercive, the evidence

23   presented was that Serna was interviewed last because he was the last one arrested; Serna's

24   interrogation was delayed not because of some police tactic but because Quinonez was busy

25   interviewing other subjects who had been arrested the same day.  *Id.* at 37.

26        I agree with the Court of Appeals that the totality of the circumstances surrounding the

27

28   _____

     [4] Although Serna did not include this claim in his direct appeal, he raised it to the Superior Court in his
     state habeas petition.  I address this claim in Section IX below.

United States District Court
Northern District of California

interrogation show that Serna voluntarily waived his *Miranda* rights.  Serna has not identified any evidence of "coercive police activity," which is a "necessary predicate" to finding involuntariness.  *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  And courts have found that the use of handcuffs *during* an interrogation does not necessarily render an interrogation unduly coercive.  *See, e.g.*, *United States v. Cisneros-Hernandez*, 597 F. App'x 933, 936 (9th Cir. 2015) ("[C]onsidering the totality of the circumstances, the alleged use of handcuffs did not render the interrogation unduly coercive."); *Gordon v. Lizarraga*, No. 12-cv-00769-PJH, 2020 WL 32335, at *15 (N.D. Cal. Jan. 2, 2020), *aff'd*, 859 F. App'x 177 (9th Cir. 2021) (finding that defendant's arguments that detective "coerced her statement by delaying removal of her handcuffs and suggesting that she would go to jail if she did not give a statement" do not amount to coercion).  As for the lack of consular notification, which is addressed in Section IX *infra*, Serna has not provided any evidence to show that the lack of timely consular notification was a police tactic designed to coerce him into waiving his *Miranda* rights.

In short, the Court of Appeals was not objectively unreasonable in concluding that Serna's *Miranda* waiver was voluntary where the record reveals an absence of coercive police activity during Serna's interrogation.

I conclude that habeas relief is not warranted for this claim.  The Court of Appeals' decision was reasonable and is entitled to AEDPA deference.  This claim is **DENIED.**

## III.   INVOLUNTARY STATEMENT (CLAIM 6)

In Serna's sixth claim, he contends that his statements to Quinonez were involuntarily obtained under the totality of the circumstances based on many of the issues described in Claim Five.  In particular, Serna argues that his will was overborne because: (1) he was afraid of retaliation from his accomplices and Quinonez made an implicit promise to protect him in exchange for a statement, and (2) Quinonez improperly appealed to his "manhood" during the course of the interrogation.  Pet. at 27–28.[5]  Neither of these arguments convinces me that the

---

[5] Serna recycles his arguments regarding the presence of the police dog and the sufficiency of the *Miranda* warnings, which I have addressed in the preceding section.  *See* Section II.B, *supra.*  Serna also claims that his will was overborne "because he was not allowed to speak with an attorney, friend, relative, or the

1    Court of Appeals' decision that Serna voluntarily confessed under the totality of the circumstances

2    was unreasonable.

3           "We consider the totality of the circumstances under a highly deferential standard to

4    determine the reasonableness of the state court's conclusion that [Serna's] statements were

5    voluntary." *Balbuena v. Sullivan*, 980 F.3d 619, 633 (9th Cir. 2020).  The factors to be considered

6    include the degree of police coercion; the length, location and continuity of the interrogation; and

7    the defendant's maturity, education, physical condition, mental health, and age.  *Withrow v.*

8    *Williams*, 507 U.S. 680, 693–94 (1993).  The voluntariness inquiry is not limited to police conduct

9    that is inherently coercive, but also applies to interrogation techniques where, under the particular

10   circumstances of the case, the confession was likely not the result of free will.  *See United States*

11   *v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014).  The voluntariness determination therefore

12   depends on "a weighing of the circumstances of pressure against the power of resistance of the

13   person confessing."  *Id.* (internal citations omitted).  In cases involving psychological coercion,

14   "the pivotal question" is whether in light of the totality of the circumstances, "the defendant's will

15   was overborne when the defendant confessed."  *United States v. Miller*, 984 F.2d 1028, 1031 (9th

16   Cir. 1993).  The interrogation techniques of the officer must be "the kind of misbehavior that so

17   shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal

18   processes of the States."  *Moran*, 475 U.S. at 433–34.

19          Serna argues that Quinonez made an "implicit promise to protect" him and coerce a

20   confession based on two statements.  First, in the beginning of the interrogation, Serna told

21   Quinonez that was afraid for his son and for himself.  *See* Aug. 12, 2014 Tr. at 267–68.  Quinonez

22   responded that: "[i]f you have something to do with this, right now is the time you have to tell

23   me."  *Id.* at 268; App. Opn. at 39.  Second, later in the interrogation, Serna told Quinonez that he

24   would tell the truth in exchange for protection.  Quinonez responded that Serna was going to be

25   taken to the jail that day and would have protection inside the jail.  Pet. at 28.  According to Serna,

26

27   consulate prior to the start of the interview." Pet. at 27–28.  The Court of Appeals noted, however, that
     Serna was allowed to make a phone call while he was waiting.  *See* App. Opn. at 37.  Under either scenario,
28   the Court of Appeals reasonably concluded that the totality of the circumstances show that Serna's
     statements were voluntarily made.

United States District Court
Northern District of California

1    these statements are a promise of protection in exchange for a confession.  *Id.*

2          The Court of Appeals reasonably concluded that Quinonez's statements were not coercive.

3    "Generally telling a suspect to speak truthfully does not amount to police coercion."  *Balbuena*,

4    980 F.3d at 629 (citation omitted).  Likewise, it was reasonable to interpret Quinonez's statement

5    regarding police protection inside the jail as reassurance of Serna's safety at the jail, not an

6    implicit promise of leniency.  *See, e.g.*, *Ortiz v. Uribe*, 671 F.3d 863, 871 (9th Cir. 2011) ("While

7    some of Detective Cardwell's statements may have affected Ortiz's decision to confess, they did

8    not constitute implicit promises of leniency.")

9          The Court of Appeals also reasonably concluded that Quinonez's praise about "being a

10   man" and coming forward and displaying concern for his son was not coercive.  Serna cited one

11   case, *People v. Esqueda*, where the court concluded that the totality of the circumstances, which

12   included the officer's appeal to the defendant's manhood, raised doubts as to whether the

13   defendant's statements were voluntary.  *See* 17 Cal. App. 4th 1450, 1486–87 (1993).  But as the

14   Court of Appeals found, *Esqueda* is distinguishable:

15

16          There, the court considered the fact that the detectives "used lies, accusations,
             exhaustion, isolation and threats" to overcome the defendant's initial resistance. (*Id.*
17           at p. 1486.) The defendant was "hysterical" at the time the interview started, and the
             officers conceded the defendant was in a fraught mental state yet "unremittingly
18           pressured" the defendant until he yielded. (*Id.* at p. 1485.) As part of its psychological
             pressure, the officers questioned and appealed to the defendant's "manhood, his
19           religion, and his Hispanic heritage." (*Ibid.*)

20          A review of the facts contemplated in *Esqueda* demonstrates how distinguishable it
             is from the situation contemplated here. There is no evidence Sergeant Quinonez
21           took advantage of Serna's mental state or used accusations and threats to obtain his
             statements. Although he mentioned Serna's son during the interrogation, his
22           suggestion to Serna that speaking to the police would be in his son's best interest
             does not rise to the level of psychological coercion overriding Serna's free will.
23           Contrary to the situation contemplated in *Esqueda*, the circumstances of Serna's
             interrogation does not compel a conclusion that his will was overborne.
24

25   App. Opn. at 40–41.  Serna has not provided any other authority to support his theory that

26   Quinonez's statements were coercive.

27          Habeas relief is not warranted for this claim.  The Court of Appeals reasonably concluded

28   that the totality of the circumstances determined that Serna's statements were voluntary; its

     United States District Court
     Northern District of California

                                                    19

1   decision is entitled to AEDPA deference.  This claim is **DENIED**.

2   **IV.   ISAIAS SERNA'S HEARSAY STATEMENT (CLAIM SEVEN)**

3          Serna charges that the trial court erred in admitting statements made by Isaias Serna,

4   Serna's son, during the criminal investigation three years earlier.  Pet. at 29–31.  A Santa Clara

5   County law enforcement officer, Deputy Herman Leon, interrogated Isaias on the same day that

6   Sergeant Quinonez interrogated Serna.  *See* Aug. 15, 2014 Tr. [Dkt. 15-13] at 498:6-15; Aug. 19,

7   2014 Tr. [Dkt. 15-15] at 1784:16-21.   During the interrogation, Isaias made multiple admissions

8   regarding his and his father's roles in the crimes.  *See* Aug. 19, 2014 Tr. at 1785:9-23.   But when

9   Isaias testified at trial, he claimed not to remember many of the facts that he had told Leon.  *See*

10  *generally* Aug. 15, 2014 Tr. at 500–12.   The trial court permitted Leon to testify about Isaias's

11  earlier statements as prior inconsistent statements after Isaias testified at trial that he did not

12  remember his interview with law enforcement, nor did he believe that reading a transcript of his

13  interview with the officer would help him remember what he had said about how the robbery was

14  planned.  *See* Aug. 19, 2014 Tr. at 1788:17–1789:8.

15         Serna argues that Isaias's interrogation statements were admitted in violation of California

16  Evidence Code section 1235 because Isaias's trial testimony about not recalling certain events was

17  not inconsistent with the statements made during his interrogation to Leon.  Pet. at 30.  Serna

18  further contends that the allegedly improper admission of this evidence violates due process.[6]

19  Traverse at 13–14.  The question that I must answer is whether the admission of Isaias's

20  interrogation statements denied Serna his right to a fundamentally fair trial guaranteed by the due

21  process clause.  *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) (explaining that the

22  erroneous admission of evidence in state trial denies a defendant due process only when the

23  evidence "so fatally infect[s] the proceedings as to render them fundamentally unfair").

24         The admission of Isaias's earlier statements did not result in a fundamentally unfair trial.

25  Serna hinges his due process argument exclusively on the alleged violation of California Evidence

26

27  ─────────────────────────
    [6] To the extent that Serna attempts to raise an evidentiary challenge based on California law, this claim is
    not cognizable on habeas review: admission of evidence in violation of state law is not a basis for habeas
28  relief.  *Estelle*, 502 U.S. at 71–72 ("As we have stated above . . . the fact that the instruction was allegedly
    incorrect under state law is not a basis for habeas relief.").

Code section 1235, but the trial court reasonably found that section 1235 applied.  A witness's

prior inconsistent statements are admissible as an exception to the hearsay rule if the earlier

statements are inconsistent with his or her trial testimony.  Cal. Evid. Code § 1235.  "In normal

circumstances, the testimony of a witness that he does not remember an event is not 'inconsistent'

with a prior statement by him describing that event."  *People v. Green*, 3 Cal. 3d 981, 988 (1971).

But where it is reasonable to conclude that a witness's "I don't remember" responses are

deliberately evasive and untruthful, such statements are admissible under section 1235.  *See id.* at

988–89; *see also People v. Ledesma*, 39 Cal. 4th 641, 711 (2006) ("As long as there is a

reasonable basis in the record for concluding that the witness's 'I don't remember' statements are

evasive and untruthful, admission of his or her prior statements is proper."); *People v. Collins*, No.

F076774, 2020 WL 6268537, at *11 (Cal. App. Ct. Oct. 26, 2020) ("It is not unusual for a court to

find sufficient basis for inconsistency under Evidence Code section 1235, when a witness testifies

to some details, but strategically forgets or declines to testify to others.").

As the Court of Appeals noted, there was a reasonable basis in the record for concluding

Isaias was not being truthful when he claimed he could not recall his earlier statements:

> Although Isaias asserted he could not recall some of the more incriminating details
> of the crime, he could recall certain details of the events leading to the robbery.  He
> claimed he could not remember certain aspects of his involvement in the crime, even
> though he personally went through a juvenile adjudication for the crime.  The trial
> court noted the juvenile adjudication proceedings should have made it easier for
> Isaias to recall certain details, thus finding his inability to recall implausible.
> Furthermore, when asked, Isaias refused to look at the transcript of the interrogation
> he had with Deputy Leon to see if it would refresh his memory of what he had
> previously said.

App. Opn. at 43.  This logic is sound.

Because Serna has not shown that Isaias' statements were improperly admitted and has

provided no other basis to support the alleged due process violation, I conclude that habeas relief

is not warranted for this claim.  The Court of Appeals' decision was reasonable and is entitled to

AEDPA deference.  This claim is **DENIED.**

**V.      JURY INSTRUCTION (CLAIM 8)**

Serna contends that the trial court erred when it instructed the jury with CALCRIM 1202

21

1   instead of CALJIC 9.53.  Both instructions discuss the elements of the crime of kidnapping to

2   commit extortion: CALCRIM 1202 states that the government must prove that "[t]he defendant

3   did so . . . to get money or something valuable," while CALJIC 9.53 provides that "[t]he

4   perpetrator of the [crime] had the specific intent . . . [to obtain something of value *from another*]."

5   (emphasis added).  Serna argues CALCRIM 1202's omission of the term "from another" renders it

6   an incorrect statement of law.  Pet. at 31–32.  But because Serna may not challenge the Court of

7   Appeals' determination that a second victim is not a necessary element of kidnapping to commit

8   extortion on habeas, Serna's challenge to the jury instruction fails.

9        Serna may not seek habeas relief on the ground that the state courts erred in administering

10   a jury instruction consistent with their determination that extortion could be committed without a

11   second victim under California law.  As noted in Section I.B.3 *supra*, a federal court sitting in

12   habeas may not grant relief for an alleged error in the interpretation or application of state law,

13   *see Swarthout v. Cooke*, 562 U.S. 216, 219 (2011), and is bound by a state court's interpretation of

14   state law.  *See Bradshaw*, 546 U.S. at 76 ("We have repeatedly held that a state court's

15   interpretation of state law, including one announced on direct appeal of the challenged conviction,

16   binds a federal court sitting in habeas corpus.").  Federal habeas courts must accept the state

17   court's identification of the elements of the offense.  *See Estelle*, 502 U.S. at 67–68 (holding that

18   "it is not the province of a federal habeas court to reexamine state-court determinations on state-

19   law questions"); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988) (rejecting argument that state appellate

20   court erred in determining the elements of the offense because "[w]e are not at liberty to depart

21   from the state appellate court's resolution of these issues of state law"); *Solis v. Garcia*, 219 F.3d

22   922, 927 (9th Cir. 2000) ("We accept, as we must, the California Supreme Court's identification

23   of the elements of the offense."); *Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) ("This

24   state-law determination—that arsenic trioxide is a poison as a matter of law and is not an element

25   of the offense to be decided by the jury—is not open to challenge on habeas review.").

26        The Court of Appeals unambiguously held that extortion could be committed without a

27   second victim under California law and that Serna's challenge to the jury instruction failed as a

28   matter of law.  *See* App. Opn. at 44; *see also id.* at 19 ("[W]e agree with *Kozlowski* and *Ibrahim*'s

conclusion that kidnapping to commit extortion does not require a secondary victim.").  Because Serna's challenge to the jury instruction is based on its underlying disagreement with the California Court of Appeals' decision regarding an element of the crime, this challenge is not cognizable on habeas review.  This claim is **DENIED.**

## VI.   DISPROPORTIONATE SENTENCE (CLAIM 9)

Serna claims that his sentence of life in prison without the possibility of parole is disproportionate to his personal culpability and crime and thus violates the Eighth Amendment. Pet. at 32–33.  Serna is wrong.

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment.  *See Solem v. Helm*, 463 U.S. 277, 303 (1983).  Yet successful challenges to the proportionality of particular sentences are "exceedingly rare" outside "the context of capital punishment."  *Id.* at 289–90 (citation omitted).  Eighth Amendment jurisprudence "gives legislatures broad discretion to fashion a sentence that fits within the scope of the proportionality principle—the precise contours of which are unclear."  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (internal quotations and citations omitted).  "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Ewing v. California*, 538 U.S. 11, 23 (2003) (internal quotation omitted).  Where it cannot be said as a threshold matter that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes.  *See United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

### A.   The Court of Appeals Reasonably Held that Serna's Sentence Was Not Disproportionate to his Personal Culpability.

Serna argues that his sentence is disproportionate to his culpability based on several factors, including his social history. Pet. at 33–34.  As the Court of Appeals recounted, Serna spoke limited English, was married with four children, and had received only a fourth grade education in Mexico.  App. Opn. at 46.  Serna's only prior convictions were for traffic-related misdemeanors, and he had no felony convictions.  *Id.*  Serna also contends that he is less culpable

1   than his accomplices because he had initially agreed to only burglarize Wise's home, not to rob

2   him.  Serna claims that he initially suggested that the men leave the house after they were

3   unsuccessful in taking the safes out, and that he was afraid of Gonzales, one of his accomplices.

4   *Id.*  He also expressed remorse for the crime.  *Id.*

5          In considering Serna's culpability, the Court of Appeals weighed the above facts against

6   the evidence that Serna "freely and equally participated in the crime."  *Id.*  In particular, the Court

7   of Appeals noted that:

8

9          Serna took part in the planning process and, although he initially told Gonzales and
           Fonseca he thought they should leave, he decided to wait with them until Wise
10         returned home.  Wise testified that he was beaten by at least three men, and Sergeant
           Quinonez confirmed that Serna admitted he participated in the attack.  Serna also
11         admitted he used a tire thumper to hit Wise, striking him with enough force to break
           the tire thumper into three pieces.  Serna also helped Gonzales and Fonseca when
12         they picked Wise up, tied him to the chair, and carried him to the safes.  Additionally,
           his accomplices, Gonzales, Fonseca, and Reyes, received similar sentences.  Based
13         on these circumstances, we find Serna has failed to show that his background or the
           circumstances of the offense were so unusual and mitigating as to render his sentence
14         of life without parole to be constitutionally excessive.

15

16         The trial court also strongly rejected Serna's argument that a sentence of life without the

17  possibility of parole was disproportionate to his conduct:

18

19         [T]his is not a dry intellectual discussion because I'm going to consider this motion
           [o]n the facts of this brutal, savage case where the defendant, acting in conjunction
20         with others, caused one of the most frightening episodes that I've ever heard in a
           courtroom to occur, one that produced injuries, one that produced solid losses and
21         was planned in advance and executed by the defendant and at least some of his
           codefendants . . . .  There was, in fact, torture for which he stands convicted.  [...]
22

23         It is not cruel and unusual punishment under the 8th Amendment or any California
           parallels.  It is appropriate.  And the fact that the defendant is not facing death on a
24         capital crime is certainly not his fault.  The fact that the victim was left with bleach
           covered rags over his head while strapped to a chair for hours, and the fact that he
25         didn't die is not something that accrues to the favor of the defendant.

26         So the defendant's motion . . . to have the laws in general or in specific in this case
           deemed cruel and unusual is denied.
27
    Dec. 5, 2014 Tr. [Dkt. 16] at 3012:3–3013:5.
28

                                                 24

In the habeas petition, Serna rehashes the same arguments that he made to the Court of Appeals without addressing the state court's ruling. *Compare* Pet. at 33–34 *with* App. Opn. at 46. He does not challenge any part of the Court of Appeals' decision. Because Serna has not shown that the Court of Appeals' decision regarding Serna's culpability was unreasonable, habeas relief is not warranted.

**B.      The Court of Appeals Reasonably Held that Serna's Sentence Was Not Disproportionate to the Penalties for More Serious Crimes in California.**

Serna argues that it is disproportionate to sentence him to life without the possibility of parole while persons who commit first degree murder in California are provided with parole hearings after 25 years. Pet. at 34. In Serna's view, because murder "has undoubtedly more serious consequences for the victim than kidnapping for extortion," his sentence is grossly disproportionate and violates the Constitution. *Id.*

In *Harmelin*, the Supreme Court upheld a life sentence without the possibility of parole for an offender whose sole felony conviction was for possessing 672 grams of cocaine. *See Harmelin v. Michigan*, 501 U.S. 957, 961, 996 (1991). And in *Andrade,* the Court upheld a sentence of two consecutive 25 year terms for the nonviolent theft of $150 worth of videotapes. 538 U.S. at 70, 77.

Habeas relief is not warranted because there was no Eighth Amendment violation. The jury found that Serna had the intent to kidnap with extortion and that he committed acts of torture. If, as in *Harmelin*, a life sentence for a single nonviolent drug possession conviction did not violate the Eighth Amendment, then Serna's sentences for kidnapping for extortion and torture also do not. And as the Court of Appeals noted, numerous courts have rejected the argument that life without the possibility of parole is constitutionally disproportionate in the context of aggravated kidnapping for robbery and ransom. App. Opn. at 47 (collecting authorities).

The Court of Appeals' rejection of Serna's claim was reasonable and is entitled to AEDPA deference. This claim is **DENIED.**

**VII.    EQUAL PROTECTION (CLAIM 10)**

Serna claims that his sentence of life in prison without possibility of parole violates his

1   right to equal protection because he is being treated differently than inmates who are convicted of

2   robbery or kidnapping for robbery, and that there is no rational basis for this disparate treatment.

3   Pet. at 35–36.  Serna claims that defendants with "substantially similar crimes" receive lesser

4   sentences because kidnapper-extortionists who cause bodily harm to their victims are sentenced to

5   life in prison *without* the possibility of parole while kidnapper-robbers who cause bodily harm to

6   their victims are sentenced to life in prison *with* the possibility of parole.  *Id.* at 36–37.  Because

7   the Court of Appeals reasonably concluded that inmates convicted of kidnapping to commit

8   extortion are not substantially similar to inmates convicted of robbery or kidnapping for robbery,

9   Serna's equal protection claim fails.

10          Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment

11   from invidious discrimination based on race, religion, or membership in a protected class subject

12   to restrictions and limitations necessitated by legitimate penological interests.  *Wolff v.*

13   *McDonnell*, 418 U.S. 539, 556 (1974); *Bell v. Wolfish*, 441 U.S. 520, 545–546 (1979).  An equal

14   protection violation typically involves state action that discriminates against members of a suspect

15   class.  State action that does not implicate a fundamental right or suspect classification withstands

16   scrutiny under the Equal Protection Clause so long as it bears a rational relation to a legitimate

17   state interest.  *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

18          The Court of Appeals disagreed that defendants convicted of kidnapping to commit

19   extortion were similarly situated to defendants convicted of kidnapping to commit robbery or

20   robbery:

21

22          Not all kidnappings to commit extortion are subjected to a heightened punishment.
            It is only those kidnappings to commit extortion that result in either *bodily harm,*
23          *death, or intentional confinement that exposes that person to a substantial likelihood*
            *of death* that are punishable by life in prison *without the possibility of parole*. (§ 209,
24          subd. (a).)  As illustrated by the statutes' wording, the two crimes are distinguishable
            in several ways: by the nature of the prohibited conduct (extortion and robbery) and
25          the elements of the crime.  Those convicted of kidnapping to commit *robbery*, unlike
            those defendants convicted of kidnapping to commit *extortion* and are punishable by
26          a term of life in prison without the possibility of parole, need not have caused the
            victim bodily harm, death, or have confined the victim in a way likely to cause death.
27

28          Thus, Serna is not similarly situated to those convicted of kidnapping to commit

United States District Court
Northern District of California

robbery.  Serna is only subject to the greater sentence of life without the possibility
of parole because the additional prerequisite—bodily harm—was found by the jury.

App. Opn. at 51–52 (emphasis in original).  Serna claims that the Court of Appeals failed to

account for the fact that "even kidnapper-robbers whose robberies result in [bodily harm] are

subject only to life in prison with the possibility of parole."  Pet. at 37.  But California does not

have any crimes called "kidnapping to commit robbery with bodily harm" or "robbery with bodily

harm."

As the Court of Appeals noted, these crimes have different elements.  App. Opn. at 51.

The crime of which Serna was convicted—kidnapping to commit extortion with bodily harm—

includes death or bodily harm as elements.  Cal. Penal Code § 209(a).  In contrast, those convicted

of robbery or kidnapping to commit robbery need not have caused the victim bodily harm, death,

or have confined the victim in a way likely to cause death.  *See* Cal. Penal Code §§ 209(b)(1),

212.5.  The California Legislature clearly had a rational basis for punishing a crime that results in

bodily harm or death more harshly than one that does not.

The Court of Appeals also reasoned that the nature of the crimes makes them

distinguishable from each other.  App. Opn. at 51.  For instance, there may be a greater risk of

bodily harm with extortion because perpetrators may resort to increasingly severe treatment of the

victim until the object of the extortion is obtained.  Such differences could give rise to a rational

basis for treating kidnapping to commit extortion and kidnapping to commit robbery differently.

The Court of Appeals' rejection of Serna's claim was reasonable and is entitled to AEDPA

deference.  This claim is **DENIED**.

## VIII.   INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON FAILURE TO CHALLENGE SEARCH WARRANT (CLAIM 11)

Serna contends that his trial counsel rendered ineffective assistance because his trial

counsel did not move to quash the search warrant to obtain Serna's historical cell site location

information ("CSLI").  Pet. at 40–45.  For the reasons set forth below, I disagree.

To prevail on a claim of ineffectiveness of counsel, Serna must establish two factors.  First,

he must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective

standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466

U.S. 668, 687–68 (1984), "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

The standards of 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation marks and citations omitted).  "[I]n reviewing the work of their peers, federal judges must begin with the 'presumption that state courts know and follow the law.'" *Dunn v. Reeves*, 141 S. Ct. 2405, 2411 (2021) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).  "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.  To answer this question, I must determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

### A.    The Superior Court Reasonably Found that the Search Warrant Was Supported by Probable Cause.

Serna's ineffective assistance claim is rooted in the premise that the search warrant was not supported by probable cause and that Serna's trial counsel was deficient by failing to move to quash it.  Serna's premise is flawed: the Santa Clara Superior Court ("Superior Court") reasonably found that the search warrant was supported by probable cause, and thus Serna's trial counsel could not have been deficient in failing to seek to quash it.

The Superior Court found that the search warrant was supported by probable cause based on the following facts:

> The affidavit in this case indicated that the crime victim reported that three Spanish speaking males attacked him and stole approximately $60,000 worth of property from his safes. The affidavit also related that a citizen informant informed the police that a suspect named Ernesto Gonzalez [*sic*] was involved in the crime with his brother and a neighbor or friend.  The affidavit further established that a phone with the number ending in 2559 had had 19 contacts with Gonzales's number on February 6, 2011, the date of the crime.   A search of various law enforcement databases revealed that the number ending in 2559 was registered to Serna and that Serna resided at a Morgan Hill address. The affidavit further mentioned that the affiant knew, based on his training and experience that suspects often use cell phones to discuss crimes they have committed or are preparing to commit.   With that information, the affiant sought a search warrant for call logs, incoming and outgoing text messages, transferred data, voicemails, CSLI, and other subscriber information for the number ending 2559. This appears to be sufficient to support a finding of probable cause.

See *In re Norberto Serna*, Case No. F1138356 (Mar. 8, 2019) ("Habeas Opn.") at 4.

The Superior Court reasonably found that probable cause existed based on those facts.  It reasonably found that the tipster was reliable.  Although Serna argued that the informant's tip was unreliable because it was purportedly made by an anonymous tipster, the tipster was not anonymous: Quinonez testified at the hearing on defendant's motion to suppress that the informant provided his name to him.  *See* Sept. 18, 2013 Tr. [Dkt. 15-5] at 41:12-26.  Because the tipster was a "citizen informant" who was not anonymous, the legal framework applicable to an anonymous tip did not apply.  Habeas Opn. at 6.  "Unlike information provided by an anonymous tip, information from a true citizen informant is considered reliable because a citizen informant can be held responsible if her allegations turn out to be fabricated."  *People v. Stanley*, 18 Cal. App. 5th 398, 405 (2017) (quotation marks and citation omitted).  And the informant knew facts about the crimes not released to the media.  Habeas Opn. at 6; *see also* Ex. 16 (Quinonez's Affidavit for Search Warrant) [Dkt. 16-13] at 14–15 (describing facts provided by citizen informant which had not been released to the media).  Based on these facts, the Superior Court reasonably rejected Serna's argument that the tipster was unreliable.

After surveying multiple decisions by federal and California courts, the Superior Court

29

reasonably held that the 19 calls between Gonzales and Serna on the day of the crime supported its finding of probable cause. *See* Habeas Opn. at 7–9. In *Andrino*, for instance, the California Court of Appeals held that a high volume of calls timed to coincide with the start of football games between a known bookmaker and a bookmaking suspect supported a finding of probable cause. *People v. Andrino*, 210 Cal. App. 3d 1395, 1399, 1403 (1989). And in *Hirata*, the Court of Appeals recognized the potential suspiciousness of a "high volume of calls" between the heads of a drug organization and the defendant, but determined that because the calls had ended six months prior to the search, the information regarding the presence of drugs was stale and the warrant issued to search the defendant's house lacked probable cause. *People v. Hirata*, 175 Cal. App. 4th 1499, 1505–06 (2009). The Superior Court reasonably analogized to *Andrino* and distinguished *Hirata*: "[h]ere, the items to be searched were Serna's historical phone records, including CSLI, which is not of the same ephemeral nature as drugs, which would not remain in the same place over time." Habeas Opn. at 9. The Superior Court's finding that probable cause existed was reasonable and supported by existing case law. Because of that, and the applicability of the good faith exception even if the search warrant was not supported by probable cause, Serna cannot show that his counsel was ineffective in failing to seek to quash it.

### B. The Superior Court Reasonably Found that the Good Faith Exception Would Have Applied.

Serna's ineffective assistance of counsel claim is doubly doomed because the Superior Court reasonably found that even if probable cause was lacking, the police acted in good faith in relying on the warrant to obtain Serna's CSLI. *Id.* at 9–11.

Under the good faith exception to the exclusionary rule, "[e]vidence seized pursuant to a facially valid search warrant which later is held to be invalid may nevertheless be admissible if officers conducting the search acted in good faith and in reasonable reliance on the warrant." *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) (citing *United States v. Leon*, 468 U.S. 897, 926 (1984)). The Superior Court found that the warrant was "valid on its face" and that the officers "acted in good faith in relying on the warrant" to obtain Serna's CSLI. Habeas Opn. at 11.

United States District Court
Northern District of California

1  Serna argued to the Superior Court that the good faith exception was inapplicable because

2  the search warrant authorized a search of Serna's records from April 1, 2010 to April 12, 2011

3  and, in Serna's view, no reasonable officer would have believed that a search of this length was

4  warranted. *Id.* at 11.  The Superior Court rejected this argument because "it [was] reasonable to

5  believe that there would be a planning period prior to the crime and that it [was] also likely that

6  the suspects might discuss the crime after its commission for the purposes of distributing proceeds,

7  disposing of evidence, or merely discussing the crime." *Id.*  Serna has not challenged the Superior

8  Court's logic on this point.  Nor has Serna articulated any other reason why the good faith

9  exception may not apply.

10  Because Serna has not shown that the Superior Court unreasonably found that the good

11  faith exception would have applied, Serna has not shown that his trial counsel was ineffective for

12  failing to move to quash the warrant.  Serna's eleventh claim for relief is **DENIED.**

13  ## IX.   INVOLUNTARINESS BASED ON LACK OF CONSULAR NOTIFICATION
            (CLAIM 12)

14  Serna contends that his statements to law enforcement and the waiver of his *Miranda*

15  rights were unknowing and involuntary under the totality of the circumstances because Serna was

16  not informed of his right to consular notification.[7]  Pet. at 45.  I disagree.

17  Article 36 of the Vienna Convention on Consular Relations "concerns consular officers'

18  access to their nationals detained by authorities in a foreign country."  *Sanchez-Llamas v. Oregon*,

19  548 U.S. 331, 337 (2006).  Article 36(1)(b) provides that if a person detained by a foreign country:

20

21  so requests, the competent authorities of the receiving State shall, without delay,
22  inform the consular post of the sending State if, within its consular district, a national
    of that State is arrested or committed to prison or to custody pending trial or is
23  detained in any other manner.  Any communication addressed to the consular post
    by the person arrested, in prison, custody or detention shall also be forwarded by the
24  said authorities without delay.  The said authorities shall inform the person concerned
    without delay of his rights under this sub-paragraph[.]

25

26

27

28  ---
    [7] Although Claim 12 incorporates Serna's other arguments regarding involuntariness from Claims 5 and 6,
    I address it separately to be consistent with the parties' briefing.

21 U.S.T., at Art. 36(1)(b), T.I.A.S. No. 6820.  The Supreme Court and California Supreme Court have assumed without deciding that Article 36 creates judicially enforceable individual rights.  *See Sanchez-Llamas*, 548 U.S. at 343; *People v. Mendoza*, 62 Cal. 4th 856, 917 (2016) ("As is our practice with claims of this nature, we assume without deciding that article 36 of the Vienna Convention created rights enforceable by individuals.").  I am not aware of any case—from the Supreme Court or otherwise—establishing that Article 36 does in fact grant such rights.  But the Supreme Court has also explained that "[a] defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police."  *Sanchez-Llamas*, 548 U.S. at 350.  As a result, I will consider Serna's claim that the lack of consular notification rendered his statements involuntary under the totality of the circumstances.

**A.    The Superior Court Reasonably Held that There Was No Prejudice.**

"A state prisoner such as [Serna] faces an array of obstacles to obtaining federal habeas relief for a state's failure to give consular notice in violation of the Vienna Convention."  *Ayala v. Davis*, 813 F.3d 880, 881 (9th Cir. 2016).  One of these obstacles is the requirement to establish prejudice from the violation.  *Id*; *see also Breard v. Greene*, 523 U.S. 371, 377 (1998) (denying habeas claim based on Vienna Convention violation where defendant failed to show that the "violation had an effect on the trial").  Serna does not dispute that prejudice is required.  The need to show prejudice from a Vienna Convention violation is a "high burden."  *Rivas v. Hatton*, No. 16-cv-0307, 2016 WL 7674792, at *13 (C.D. Cal. Nov. 18, 2016).

The Superior Court assumed that there had been a violation of Article 36 but found that Serna had not shown that prejudice had resulted from the notification violation.  Habeas Opn. at 13.  It found that consular notification was not necessary to properly advise Serna of his rights.  *Id.* at 13–14.  The Superior Court reasoned that Serna had received *Miranda* warnings in Spanish and that the Court of Appeals had determined that these warnings adequately advised Serna of his rights.  *Id.* at 14.  And although Serna had submitted a declaration stating that he did not understand what was said to him, the Superior Court was unconvinced by Serna's "self-serving" declaration based on its review of the evidentiary record.  *Id.*

1    The Superior Court reasonably held that Serna had not established prejudice arising from

2 the consular notification violation.  Courts around the country—including the Supreme Court of

3 California—have found no prejudice flowing from a consular notification violation where the

4 defendant is advised of his rights under *Miranda* and nonetheless chooses to waive these rights.

5 *See, e.g.*, *People v. Leon*, 8 Cal. 5th 831, 847 (2020), *reh'g denied* (Apr. 15, 2020) (affirming

6 lower court's finding of no prejudice where "Defendant's immediate, continued, and active

7 participation belies the suggestion he would have remained silent if advised of his consular

8 rights"); *Keomanivong v. Jacquez*, No. 07-cv-02409, 2010 WL 843755, at *15 (E.D. Cal. Mar. 9,

9 2010) (finding no prejudice stemming from failure to comply with Vienna Convention in part

10 because foreign detainee "had spent time in the United States" and had been "fully advised of his

11 constitutional rights under *Miranda* . . . before the police took his statement"); *Rivas*, 2016 WL

12 7674792, at *15 (finding no prejudice where "Petitioner had earlier been advised of his *Miranda*

13 rights by a Spanish-speaking officer and validly waived them"); *United States v. Rodrigues*, 68 F.

14 Supp. 2d 178, 184 (E.D.N.Y. 1999) ("Prejudice has never been—nor could reasonably be—found"

15 from a violation of Article 36 "in a case where a foreign national was given, understood, and

16 waived his or her *Miranda* rights . . . because the advice a consular official would give would

17 simply augment the content of *Miranda*, which the foreign national has already waived.");

18 *Sanchez-Toribio v. Sec'y, Fla. Dep't of Corr.*, 557 F. Supp. 2d 1322, 1336 (M.D. Fla. 2008)

19 (finding no prejudice arising from failure to comply with Vienna Convention where Mexican

20 prisoner had "intelligently, knowingly, and voluntarily waived his *Miranda* rights and confessed");

21 *United States v. Chung*, No. 13-CR-379, 2016 WL 6440128, at *3 (N.D. Ga. Oct. 28, 2016)

22 (rejecting argument that failure to comply with Vienna Convention rendered waiver of *Miranda*

23 rights and subsequent statements involuntary where defendant was adequately advised of *Miranda*

24 rights); *State v. Morales-Mulato*, 744 N.W.2d 679, 686–87 (Minn. Ct. App. 2008) (rejecting claim

25 that waiver was involuntary due to lack of consular notification where defendant was adequately

26 informed of rights under *Miranda*).

27    Here, the Court of Appeals held that "Serna was sufficiently apprised of his *Miranda* rights

28 under the totality of the circumstances."  App. Opn. at 35.  And the Superior Court found that

1   Serna's assertion that he did not understand the *Miranda* advisements was "belied by the record."

2   Habeas Opn. at 14.  In light of the case law described above, the Superior Court's decision that

3   Serna had not shown prejudice arising from the consular notification violation was not

4   "objectively unreasonable" under 28 U.S.C. § 2254(d)(1).  *See Ayala*, 813 F.3d at 881 ("[O]ur

5   conclusion that the state court's no prejudice finding was not 'objectively unreasonable' precludes

6   granting relief in this AEDPA case.").

7           **B.      The Superior Court Did Not Engage in an Unreasonable Fact-Finding Process.**

8           In the traverse, Serna argues that the Superior Court's underlying factual determination

9   that there was no prejudice was an unreasonable determination of the facts under 28 U.S.C. §

10  2254(d)(2) because the state court did not conduct an evidentiary hearing on his claim.  Traverse

11  at 5.  Serna specifically charges that the Superior Court made unreasonable determinations of two

12  facts.  First, Serna contends that "the state court could not reasonably conclude, without holding a

13  hearing, that Mr. Serna would have only received a letter from the consulate."  *Id.* at 6.  Second,

14  Serna insists that the Superior Court "was unreasonable in failing to take petitioner's word that he

15  would have utilized his right to consular assistance if he had been properly informed."  *Id.* at 8.

16  But because the evidence already in the record was sufficient to resolve the question of prejudice

17  without respect to either point, the Superior Court's failure to hold an evidentiary hearing on these

18  issues does not render its fact-finding process unreasonable under section 2254(d)(2).

19          "In some limited circumstances, we have held that the state court's failure to hold an

20  evidentiary hearing may render its fact-finding process unreasonable under § 2254(d)(2)."

21  *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012).  "But we have never held that a state

22  court must conduct an evidentiary hearing to resolve every disputed factual question; such a per se

23  rule would be counter not only to the deference owed to state courts under AEDPA, but to

24  Supreme Court precedent."  *Id.*  "A state court's decision not to hold an evidentiary hearing does

25  not render its fact-finding process unreasonable so long as the state court could have reasonably

26  concluded that the evidence already adduced was sufficient to resolve the factual question."  *Id.*

27  "The ultimate question . . . is whether an appellate court would be *unreasonable* in holding that an

28

1    evidentiary hearing was not necessary in light of the state court record." *Id.* at 1148 (emphasis in

2    original) (citation omitted).

3            Serna's first argument regarding the letter mischaracterizes the Superior Court's decision:

4    the Superior Court never found that "Serna would have only received a letter from the consulate."

5    Rather, the Superior Court expressed skepticism that Serna would have waited for consular

6    assistance before speaking to law enforcement, especially since Serna chose to waive his *Miranda*

7    rights.  Habeas Opn. at 15.  Serna's first argument fails because the Superior Court did not make

8    any factual findings regarding what kinds of services the consulate would have provided to Serna.[8]

9            Second, Serna takes issue with the Superior Court's decision not to credit Serna's

10   statement in his July 18, 2017 declaration that he would not have spoken to the officers if he had

11   been informed of his Article 36 consular rights.  But the Superior Court did not make this decision

12   in a vacuum—the Superior Court characterized Serna's "self-serving" statement as "unpersuasive"

13   because "when confronted with his right to remain silent and his right to have the assistance of an

14   attorney during questioning, the bedrock rights provided to an in-custody criminal suspect, Serna

15   chose to waive those rights and speak to the police." *Id.*  In other words, the Superior Court based

16   its credibility determination on Serna's own conduct on the day in question; Serna's theoretical

17   assertions in 2017 about what he would have done differently were measured against what Serna

18   actually did in 2011 when advised of his *Miranda* rights.  Serna has not provided any authority

19   indicating that the Superior Court erred in factoring in such evidence when evaluating Serna's

20   credibility.

21

22

23    ─────────────────

24    [8] As part of the materials supporting his state habeas petition, Serna submitted a letter and two declarations
     from consulate officials.  The letter indicated that normally, when a consulate is notified that a Mexican
25    national is detained, the consulate will send a letter explaining the legal procedures in the United States and
     the detainee's rights during the judicial process.  Habeas Opn. at 15; *see also* Wilma Laura Gandoy
26    Vázquez Letter [Dkt. 16-13] at 57.  Consular officials in San Francisco and San Jose also submitted
     declarations indicating that in serious cases such as Serna's, "the consular response would consist of a
27    telephone call to and/or a direct visit with the detainee as soon as contact or visitation could be arranged
     with the detaining agency," and that the Consulate General of Mexico in San Jose "would have attempted
28    to visit him or speak with him by telephone that same day."  *See* Declaration of Wilma Laura Gandoy
     Vázquez [Dkt. 16-13] at 212; Declaration of Rodrigo Navarro García [Dkt. 16-13] at 215.

United States District Court
Northern District of California

The Superior Court's underlying factual finding regarding the lack of prejudice was amply supported by the existing record. As described above, courts routinely find no prejudice arising from a consular notification violation where the defendant has waived his *Miranda* rights. *Cf. Rodrigues*, 68 F. Supp. 2d at 184 ("Prejudice has never been—nor could reasonably be—found" from a violation of Article 36 "in a case where a foreign national was given, understood, and waived his or her *Miranda* rights . . . because the advice a consular official would give would simply augment the content of *Miranda*, which the foreign national has already waived."). Because the evidence already in the record was sufficient to resolve the question of prejudice, the Superior Court's failure to hold an evidentiary hearing to address Serna's credibility does not render its fact-finding process unreasonable under section 2254(d)(2).

Habeas relief is not warranted. The Superior Court reasonably found that Serna had not shown prejudice arising from the consular notification violation. Serna's twelfth claim for relief is **DENIED.**

## X.  INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON FAILURE TO OBJECT THAT LACK OF CONSULAR NOTIFICATION RENDERED SERNA'S STATEMENT INVOLUNTARY (CLAIM 13)

Serna contends that his trial counsel rendered ineffective assistance by failing to object that Serna's statements to law enforcement and the waiver of his *Miranda* rights were unknowing and involuntary under the totality of the circumstances because Serna was not informed of his right to consular notification. Pet. at 52. I again disagree.

The Superior Court held that Serna's trial counsel did not provide inadequate assistance because any motion regarding the consular notification violation would have been meritless. Habeas Opn. at 15. It reasoned that "if Serna had been informed of his Article 36 rights, there is nothing, other than his self-serving statement made years after the fact, to indicate that he would have waited for consular assistance and that he would not have spoken to the police." *Id.* Because there would have been "no ground to make the motion," the Superior Court denied Serna's ineffective assistance of claim. *Id.*

Serna has not shown that the Superior Court's application of the *Strickland* standard was objectively unreasonable. As the Superior Court noted, Serna needed to establish prejudice for

United States District Court
Northern District of California

1    both a violation of Article 36 and an ineffective assistance of counsel claim.  Habeas Opn. at 13.  I

2    have already concluded that the Superior Court reasonably found that Serna had not shown

3    prejudice arising from the consular notification violation.  As a result, it also reasonably concluded

4    that Serna's counsel was not ineffective for failing to object to the consular notification violation.

5         Habeas relief is not warranted.  Serna's thirteenth claim for relief fails because the

6    Superior Court reasonably found that Serna's trial counsel was not ineffective.  This claim is

7    **DENIED.**

8    ## XI.   CUMULATIVE ERRORS (CLAIM 14)

9         Serna's final claim rests on the premise that the cumulative effect of errors introduced

10   during the trial are sufficiently prejudicial to warrant a new trial or reversal of his convictions and

11   sentence.  Pet. at 54.  In some cases, while no single trial error is sufficiently prejudicial to warrant

12   reversal, the cumulative effect of several errors may still prejudice a defendant so much that his

13   conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003)

14   (reversing conviction where multiple constitutional errors hindered defendant's efforts to

15   challenge every important element of proof offered by prosecution).  Where there is no single

16   constitutional error, however, nothing can rise to the level of a constitutional violation.  *See*

17   *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

18        Serna has not shown that there was even one constitutional error.  Serna may disagree with

19   the decisions of the Court of Appeals and Superior Court, but he has not shown that they were

20   unreasonable under clearly established federal law.  Accordingly, his claim of cumulative error is

21   **DENIED**.

22   ## XII.  MOTION FOR EVIDENTIARY HEARING AND DISCOVERY

23        Serna requests an evidentiary hearing and discovery to develop the factual record for

24   Claims 12 and 13.  *See* Request for Evidentiary Hearing and Discovery ("Mot.") [Dkt. 23] at 1–2.

25   Because Serna has not shown that an evidentiary hearing or discovery would result in any

26   evidence which would entitle Serna to habeas relief, his request is denied.

27        AEDPA prohibits an evidentiary hearing where a petitioner has not been diligent in

28   pursuing his claims in state court.  *See* 28 U.S.C. § 2254(e)(2).  In addition to finding

United States District Court
Northern District of California

1    diligence, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider

2    whether such a hearing could enable an applicant to prove the petition's factual allegations," and

3    whether those allegations, if true, would entitle him to relief. *Schriro*, 550 U.S. at 474; *see also*

4    *Ochoa v. Davis*, 50 F.4th 865, 890–91 (9th Cir. 2022) (same).  The parties dispute whether or not

5    Serna has shown that he was diligent in pursuing his claims in state court.  *See* Mot. at 2,

6    Opposition to Requests for Evidentiary Hearing and Discovery ("Opp.") at 7.  Regardless, an

7    evidentiary hearing is not warranted because Serna has not shown that an evidentiary hearing

8    would move the needle on any of his habeas claims.[9]

9         Serna argues that an evidentiary hearing or discovery is needed so that he can present

10   evidence that "he would have availed himself of the consulate's assistance and that he would not

11   have made incriminating statements if properly informed of his rights."  Mot. at 6.  But Serna

12   submitted a declaration to that effect in his state habeas proceeding, which the Superior Court

13   found to be not credible.  Serna has not identified any other evidence that could show that the

14   consular advisement would have dissuaded him from making a police statement.  Because Serna

15   has not shown that an evidentiary hearing could result in any useful evidence to prove the factual

16   allegations in his petition, an evidentiary hearing is not warranted.  And for the same reason, Serna

17   has not shown that discovery is merited.

18                                          **CONCLUSION**

19        The state courts' adjudication of Serna's claims did not result in decisions that were

20   contrary to, or involved an unreasonable application of, clearly established federal law, nor did

21   they result in decisions that were based on an unreasonable determination of the facts in light of

22   the evidence presented in the state court proceeding.  Accordingly, the petition is **DENIED**.

23

24

25

26   ───────────────────────
     [9] Serna also asserts that he would use an evidentiary hearing to present evidence that the *Miranda* warnings
27   that he was provided were made in broken Spanish and did not effectively communicate his rights.  Mot. at
     6.  Serna does not acknowledge that he already provided such evidence through an expert to the trial court.
28   App. Opn. at 29–30.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Serna may seek a certificate of appealability from the Ninth Circuit.

**IT IS SO ORDERED.**

Dated: January 11, 2023



William H. Orrick
United States District Judge